## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, STATE OF NEW YORK, and STATE OF NEW JERSEY, | Case No. _____ |
| *ex rel.* [UNDER SEAL], | Hon. _____ |
| **Plaintiff/Relator,** | |
| vs. | **QUI TAM COMPLAINT**<br>**FILED UNDER SEAL**<br>**PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| [UNDER SEAL] | **JURY TRIAL DEMANDED** |
| **Defendant[s].** | |

Eric H. Jaso
SPIRO HARRISON
830 Morris Turnpike
Second Floor
Short Hills, NJ 07078
(973) 232-0881
ejaso@spiroharrison.com
*Attorneys for Plaintiff/Relator*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, STATE OF NEW YORK, and STATE OF NEW JERSEY, | Case No. _____ |
| *ex rel.* LAUREN SIMPSON, | Hon. _____ |
| **Plaintiff/Relator,** | |
| vs. | **QUI TAM COMPLAINT FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| HQRC MANAGEMENT SERVICES LLC, MZC DENTISTRY MANAGEMENT, LLC, PEDIATRIC DENTISTRY OF PATERSON, PEDIATRIC DENTISTRY OF TEANECK, PEDIATRIC DENTISTRY OF WYKOFF, PEDIATRIC DENTISTRY OF FLUSHING, PEDIATRIC DENTISTRY OF BRONX, PEDIATRIC DENTISTRY OF VALLEY STREAM, PEDIATRIC DENTISTRY ON AVENUE U, PEDIATRIC DENTISTRY OF BORO PARK, PEDIATRIC DENTISTRY OF MONSEY, PEDIATRIC DENTISTRY OF KINGSTON, PEDIATRIC DENTISTRY OF ALBANY, PEDIATRIC DENTISTRY OF MALONE, NORTH COUNTRY PEDIATRIC DENTISTRY, KEVIN QUINN, and BARRY L. JACOBSON; **Defendants.** | **JURY TRIAL DEMANDED** |

Eric H. Jaso
SPIRO HARRISON
830 Morris Turnpike
Second Floor
Short Hills, NJ 07078
(973) 232-0881
ejaso@spiroharrison.com
*Attorneys for Plaintiff/Relator*

**COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS UNDER
31 U.S.C. § 3729 ET SEQ. AND NEW JERSEY AND NEW YORK STATE
COUNTERPARTS**

On behalf of the United States of America, the State of New Jersey, and the State of New York, Plaintiff and Relator Lauren Simpson ("Relator"), by and through her attorney, files this *qui tam* action against Defendants HQRC Management Services LLC, MZC Dentistry Management, LLC, Pediatric Dentistry of Paterson, Pediatric Dentistry of Teaneck, Pediatric Dentistry of Wycoff, Pediatric Dentistry of Flushing, Pediatric Dentistry of Bronx, Pediatric Dentistry of Valley Stream, Pediatric Dentistry on Avenue U, Pediatric Dentistry of Boro Park, Pediatric Dentistry of Monsey, Pediatric Dentistry of Kingston, Pediatric Dentistry of Albany, Pediatric Dentistry of Malone, North Country Pediatric Dentistry, and John Doe Corporations 1-10 (the "Defendant Dental Practices") and Defendants Kevin Quinn, Barry L. Jacobson, and John and Jane Does 1-10 (the "Individual Defendants") (collectively "Defendants") and alleges as follows:

## I.     INTRODUCTION

### A.     Federal Law Claims

1.     Relator brings this action to blow the whistle on an intentional, illegal scheme by Defendants to defraud the New Jersey and New York State Medicaid programs and other government health insurance programs by billing for services and procedures not rendered (or not fully and properly rendered), billing for services and procedures which were not medically necessary, by creating, altering, or otherwise keeping false and fraudulent healthcare documentation, and by inducing and rewarding patient referrals through the payment of incentive compensation which constituted illegal kickbacks, all in violation of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA").

2.     Pursuant to the FCA, Relator seeks to recover, on behalf of the United States of America, damages and civil penalties arising from false and/or fraudulent claims that Defendants submitted or caused to be submitted to Federally-funded health insurance programs for services and procedures purportedly rendered at the Defendant Dental Practices, including payments made by Medicaid and other government health insurance programs.

**B.     State Law Claims**

3.     This is also an action to recover double and treble damages and civil penalties on behalf of the States of New Jersey and New York arising from the conduct of Defendants who: (a) made, used or presented, or caused to be made, used or presented, certain false or fraudulent statements, records and/or claims for payment or approval to the State; and/or (b) made, used or caused to be made or used false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State, all in violation of the New Jersey False Claims Act, N.J. Stat. § 2A:32C-1 through § 2A:32C-17, and the New York False Claims Act, N.Y. State Fin. Law §§ 187-194. The false or fraudulent claims, statements and records at issue involve payments made by health insurance programs funded by the State government, including Medicaid.

**II.     SUMMARY OF ALLEGATIONS**

4.     Defendant Barry L. Jacobson, D.M.D., F.A.A.P.D., advertises himself to be "at the forefront of pediatric dentistry," boasting a "reputation as a leader in pediatric dental technologies," who "has become known as New York's caring child dentist by offering a positive, comfortable and fun experience for kids." Touting his nearly two decades of experience, Dr. Jacobson claims that "[a]s a true advocate for kids, I am devoted to ensuring that children get the best dental care possible[.]" (EINPresswire.com Press Release, Jan. 22, 2014)

5.      While basing his practice at a modern office located on Park Avenue in Manhattan (bearing the motto, "Sophisticated Kids Need Sophisticated Care," Dr. Jacobson has built a virtual dentistry empire, acquiring over a dozen pediatric dental practices from New Jersey to upstate New York.  Dr. Jacobson's aspirations were boosted in 2015 with cash infused by Webster Capital, an outside investment firm that "focuses on . . . healthcare services companies with EBITDA between $3 million to $15 million."

6.      Initially hired as an office manager at North Country Pediatric Dentistry in Plattsburgh, New York, Relator Lauren Simpson eventually was given responsibility for managing five of Dr. Jacobson's upstate New York dental practices.  In those capacities, Relator learned that his pediatric dentistry empire is largely built on defrauding government healthcare programs, particularly Medicaid.

7.      At Dr. Jacobson's pediatric dental practices across New York and northern New Jersey, management pressures and cajoles dentists and hygienists to ever-higher revenue targets, which they achieve primarily by providing medically unnecessary procedures and/or by billing for procedures that were either never rendered, or partially rendered (and thus ineffectual) to save time and increase patient volumes.

8.      Among other things, the dentists at these practices routinely bill for filling a virtual mouthful of cavities, when the child patient may have only a few (or even none at all). Compounding the fraud, some dentists do not even bother drilling the teeth (cavity or not) but instead place filling compound on teeth to make it appear that cavities were drilled and filled, when in fact they were not.

9.      Management also created unlawful financial incentives for providers, as well as office managers and staff members, to increase and maximize the number of patients referred to

the practices. Most providers, managers and staff entered into agreements whereby they would receive cash bonuses directly tied to meeting or exceeding patient headcount, procedure and/or revenue goals, which targets management set in advance and tracked closely.

10.     Some providers, ever eager to increase their own compensation, paid cash bribes to staff (for example, office managers and schedulers) to increase the numbers of patients they saw, so as to meet and exceed their management-set goals. Often these bribes were paid "under the table" in cash or in the form of gifts or expensive entertainment.

11.     Relator brings this *qui tam* action to recover, for the United States, New Jersey, and New York State Governments, funds that Defendants illegally obtained by submitting false claims for reimbursement for pediatric dental services to Medicaid and other government health insurance programs.

12.     Relator also brings this action for damages resulting from her unlawful and retaliatory termination from employment due to her voicing concerns to management about Defendants' illegal practices.

## III.     JURISDICTION, VENUE, AND SPECIAL REQUIREMENTS

13.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the subject matter of this civil action because it arises under the laws of the United States, in particular, the False Claims Act, 31 U.S.C. § 3729, *et seq*.

14.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the subject matter of the claims brought pursuant to the New Jersey and New York False Claims Acts on the ground that the claims are so related to the claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

15. In addition, the FCA specifically confers jurisdiction upon United States District Courts under 31 U.S.C. § 3732. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants maintain offices and conduct business in the District of New Jersey.

16. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendant Barry Jacobson, through Defendant HQRC, the parent company of the Defendant Dental Offices, owns and runs at least three such Offices in New Jersey, and because certain acts complained of herein occurred in the District of New Jersey.

17. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because the False Claims Act authorizes nationwide service of process and Defendants have sufficient minimum contacts with the United States of America.

18. In accordance with 31 U.S.C. § 3730(b)(2), this Complaint has been filed *in camera* and will remain under seal for a period of at least 60 days, and shall not be served on the Defendants until the Court so orders.

19. Pursuant to 31 U.S.C. § 3730(b)(2), the Relator must provide the Government with a copy of the Complaint and/or a written disclosure of substantially all material evidence and material information in her possession contemporaneous with the filing of the Complaint. Relator complies with this provision by serving copies of this Complaint, and a written disclosure accompanied by material evidence, upon the Honorable William E. Fitzpatrick, Acting United States Attorney for the District of New Jersey, and upon the Honorable Jeff Sessions, Attorney General of the United States. Relator similarly complies with the corresponding State False Claims Acts by serving Attorneys General Christopher S. Porrino of New Jersey and Eric T. Schneiderman of New York with the Complaint and disclosure.

20.     Relator is not aware that the allegations in this Complaint have been publicly disclosed.  Further, to the extent Relator is aware of any public disclosures, this Complaint is not based on such public disclosures.  In any event, this Court has jurisdiction under 31 U.S.C. § 3730(e)(4) because the Relator is an "original source" since she has voluntarily provided her information to the Government before filing this Complaint, and has knowledge which is both direct and independent of, and materially adds to, any public disclosures to the extent they may exist.

## IV.     THE PARTIES

21.     Plaintiff/Relator Lauren Simpson resides at 4 Tennessee Road, #2, Plattsburgh, NY 12903.  From on or about March 27, 2014 through on or about May 27, 2016, she worked for HQRC Management Services LLC ("HQRC") managing various offices as assigned.  In or about June 2014, she married, and began using the name Lauren Brindisi for professional purposes, but she has not legally changed her name.

22.     Defendant HQRC is a for-profit Delaware Limited-Liability Corporation with principal offices located at 29 North Airmont Road, Suite 22, Suffern, NY 10901.

23.     Defendant MZC Dentistry Management, LLC ("MZC") is a for-profit New York Limited-Liability Corporation with principal offices located at 80 Business Park Drive, Suite 103, Armonk, NY 10504.  Previously, including in or about 2012, MZC reported its principal office address to be 751 Teaneck Road, Teaneck, NJ 07666.

24.     HQRC and MZC primarily do business under the names of the following Dental Practices:

25.     Pediatric Dentistry of Paterson is a pediatric dental practice located at 1 West Broadway, Second Floor, Paterson, NJ 07505.

26.     Pediatric Dentistry of Teaneck is a pediatric dental practice located at 751 Teaneck Road, Teaneck, NJ 07666.

27.     Pediatric Dentistry of Wyckoff is a pediatric dental practice located at 260 Godwin Avenue, Suite 6, Wyckoff, NJ 07481.

28.     Pediatric Dentistry of Flushing is a pediatric dental practice located at 135-14 Jewel Avenue, Flushing, NY 11367.

29.     Pediatric Dentistry of Bronx is a pediatric dental practice located at 3201 Grand Concourse, Suite 1E, Bronx, NY 10468.

30.     Pediatric Dentistry of Valley Stream is a pediatric dental practice located at 509 West Merrick Road, Suite 103, Valley Stream, NY 11580.

31.     Pediatric Dentistry on Avenue U is a pediatric dental practice located at 817 Avenue U, Brooklyn, NY 11223.

32.     Pediatric Dentistry of Boro Park is a pediatric dental practice located at 1526 50th Street, Brooklyn, NY 11219.

33.     Pediatric Dentistry of Monsey is a pediatric dental practice located at 29 North Airmont Road, Suffern, NY 10901.

34.     Pediatric Dentistry of Kingston is a pediatric dental practice located at 169 Washington Avenue, Kingston, NY 12401.

35.     Pediatric Dentistry of Albany is a pediatric dental practice located at 980 Western Avenue, Albany, NY 12203.

36.     Pediatric Dentistry of Malone is a pediatric dental practice located at 447 Main Street, Malone, NY 12953.

37.     North Country Pediatric Dentistry ("North Country") is a pediatric dental practice located at 5 Cornelia Street, Plattsburgh, NY 12901.

38.     Upon information and belief, Defendant Kevin Quinn is a resident of Washington, D.C. At all times relevant to this Complaint, Quinn was Chief Operating Officer of HQRC.

39.     Barry L. Jacobson, D.M.D., F.A.A.P.D. ("Dr. Jacobson"), is a resident of Alpine, New Jersey. Upon information and belief, he has an ownership interest in, and/or ultimate managerial control over, HQRC and thus over each of the Defendant Dental Practices.

## V.     GOVERNING LAWS, REGULATIONS, AND CODES OF CONDUCT

### A.     The Federal False Claims Act

40.     Originally enacted in 1863, the FCA was substantially amended in 1986 by the False Claims Amendments Act. The 1986 amendments enhanced the Government's ability to recover losses sustained as a result of fraud against the United States. Further clarifying amendments were adopted in May 2009 and March 2010.

41.     The FCA imposes liability upon any person who "knowingly presents, or causes to be presented [to the Government] a false or fraudulent claim for payment or approval"; or "knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim"; or "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(A), (B), (G). Any person found to have violated these provisions or conspired to have violated these provisions is liable for a civil penalty of up to $11,000 for each such false or fraudulent claim, plus three times the amount of the damages sustained by the Government.

42.     Significantly, the FCA imposes liability where the conduct is merely "in reckless disregard of the truth or falsity of the information" and further clarifies that "no proof of specific intent to defraud" is required. 31 U.S.C. § 3729(b)(1).

43.     The FCA also broadly defines a "claim" as one that includes "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that – (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government – (i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A).

44.     The FCA empowers private persons having information regarding a false or fraudulent claim against the Government to bring an action on behalf of the Government and to share in any recovery.  The complaint must be filed under seal without service on any Defendant. The complaint remains under seal while the Government conducts an investigation of the allegations in the complaint and determines whether to intervene in the action. 31 U.S.C. § 3730(b).

45.     In this action, and under well-established precedent, the false or fraudulent nature of Defendant's conduct is informed or measured by its violation of, or failure to comply with, certain statutes and regulations material to governing: requirements that healthcare providers must meet in order for dental procedures to qualify for reimbursement under government-funded assistance programs such as Medicaid; and requirements that providers must meet in order for

dental procedures to qualify for payment under other government-funded healthcare programs such as FEHBP and TRICARE.

### B. State False Claims Acts

46.     Both New York and New Jersey have enacted False Claims Acts which closely parallel the Federal False Claims Act in both text and substance.

47.     Because New York and New Jersey pay for approximately half of their respective Medicaid expenditures, Medicaid fraud is actionable under their False Claims Acts.

### C. Federal Government-Funded Health Assistance Programs

### 1. Medicaid

48.     The Medicaid program was created in 1965 when Congress enacted Title XIX of the Social Security Act to expand the nation's medical assistance program to cover the medically needy aged, the blind, the disabled, and needy families with dependent children. 42 U.S.C. §§ 1396-1396v. The Medicaid program is funded by both federal and state monies, (collectively referred to as "Medicaid Funds"), with the federal contribution computed separately for each state. 42 U.S.C. §§ 1396b; 1396d(b). At the federal level, Medicaid is administered by CMS. Medicaid is used by 49 states, each of which has a state Medicaid agency to administer the program.

49.     Each state is permitted, within certain parameters, to design its own medical assistance plan, subject to approval by the HHS. Among other forms of medical assistance, the states are permitted to provide medical assistance from the Medicaid Funds to eligible persons for diagnostic procedures. 42 U.S.C. § 1396a(10)(A); 1396d(a)(12).

**2. Prohibitions Against Claims for Reimbursement for Services that were Not Provided as Claimed, were Not Medically Necessary, or are Otherwise False or Fraudulent**

50.     Federal law prohibits a person from knowingly presenting or causing to be presented to Medicaid a claim for a medical or other item or service that the person knows or should know was "not provided as claimed," a claim for such items or services that the person knows or should know is "false or fraudulent," or a claim that is "for a pattern of medical or other items or services that [the] person knows or should know are not medically necessary." 42 U.S.C. §§ 1320a-7a(a)(1)(A), (B) & (E).

51.     Federal law similarly penalizes a person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim for payment for items and services furnished under a Federal health care program." *Id.* § 1320a-7a(a)(8).

52.     Violation of this section is subject to a civil monetary penalty of $11,000[1] for each item or service, plus damages measured as three times the amount of each claim submitted, and exclusion from further participation in the programs. *Id.* § 1320a-7a(a).

## VI.     SPECIFIC ALLEGATIONS

### A. *Background and Rapid Growth of Dr. Jacobson's Pediatric Dental Empire*

53.     Dr. Jacobson is a graduate (D.M.D.) of the University of Medicine and Dentistry of New Jersey. He took his residency in pediatric dentistry at Maimonides Medical Center in Brooklyn, New York.

54.     Dr. Jacobson publicly claims to be a "leading specialist in Pediatric Dentistry . . . for over 17 years[.]" He states that he was "the first Pediatric Dentist to standardize laser

---

[1] By regulation, the maximum per-claim penalty was recently increased to $21,563. 81 Fed. Reg. 42491, 42494 (Jun. 30, 2016) (effective Aug. 1, 2016).

dentistry for children.  He also performed the first laser pediatric dental crown without anesthesia."  He also claims to have performed "over 20,000 sedation and general anesthesia oral rehabilitation cases on children with Early Childhood Caries and Baby Bottle Tooth Decay." (www.barryjacobson.com) (last viewed September 21, 2016).

55.     Dr. Jacobson states that he was the Chief of Pediatric Dentistry, as well as Founder and Director of the postgraduate pediatric dentistry residency program at Mount Sinai Hospital in New York City from 2000-2010.  (*Id.*)

56.     Currently, Mount Sinai lists Dr. Jacobson as an Assistant Clinical Professor in Pediatric Dentistry.  (www.mountsinai.org/profiles/barry-l-jacobson) (last visited September 21, 2016).

57.     Upon information and belief, Dr. Jacobson has for at least a decade built his pediatric dental business, HQRC, by acquiring existing dental practices in areas within New Jersey and New York which serve large Medicaid populations. In 2015, Webster Capital ("Webster"), a private-equity partnership based in Massachusetts, made a significant investment in HQRC. (Webster Capital press release)

58.     Upon information and belief, Webster's investment in HQRC was in the multiple millions of dollars, and was premised upon the expectation that HQRC's revenues would continue to increase dramatically along with the number of dental practices.

59.     Upon information and belief, Webster installed Defendant Quinn as COO of HQRC and assigned him to track its financial performance and to push management and staff to increase revenues.

60.     Dr. Jacobson continues to open and acquire new practices, and recruit individual dentists to work at his offices.

61.     For example, at the American Association of Pediatric Dentistry annual convention in San Antonio, Texas in May 2016, HQRC sponsored a "happy hour" seeking to attract attendees who were interested in starting a career in pediatric dentistry or selling their practice. (HQRC Management Services_Overview_LinkedIN)

62.     Dr. Jacobson also personally hosts frequent "meet and greets" with pediatric dentists in New York City, picking up their lunch and dinner tabs. He will soon (early May 2017) be hosting an "after boards" party at a restaurant to congratulate junior pediatric dentists on having completed their New York State dental board examinations. He uses such events as an opportunity to bolster the professional image of his practice groups as well as to recruit new pediatric dentists to join his business.

### B. *Dr. Jacobson Hires Relator as an Office Manager*

63.     Relator graduated from Plattsburgh High School in 2007 and attended Clinton Community College for approximately 1 ½ years, studying nursing.

64.     In 2012, Relator started working for an oral surgeon as a surgical assistant. She subsequently worked for another area dental practice as a patient care coordinator. In those jobs, Relator got no experience billing Medicaid or other government health insurance programs.

65.     In early 2014, a new job opportunity came to Relator's attention – North Country Pediatric Dentistry was advertising for an office manager.

66.     She interviewed with Emma Souli, a longstanding administrator for Dr. Jacobson, and was hired on the spot, starting work the very next day, on March 27, 2014.

### C. *Kickbacks – Incentive Compensation Tied to Patient Volume & Reimbursement Revenues*

67.     As a matter of practice, Defendants' upper management provided dentists, hygienists, managers, and other employees, with express and specific economic incentives and

rewards based solely and directly upon the amount of revenues the Dental Practices were able to develop.

68.     Relator was a salaried manager, paid $45,000 annually. However, as an office manager, she could get raises or otherwise supplement her salary by meeting or exceeding goals set by Dr. Jacobson and other executives, primarily based on "production" – *i.e.*, monthly office revenues, which in the practices derive mostly from Medicaid reimbursements.

69.     Internal records show that upper management imposes quotas on office managers, including Relator, which goals are directly tied to revenues (and thus to the managers' incentive compensation).

70.     One key metric was "Patients/Ped[iatric] Provider/Day." (Production by Office March 2016) Management decreed that 25 patients per provider per day was "Acceptable" while 35 was "Great."

71.     Patients who were "no shows" were also tracked, and staff were instructed to take whatever measures necessary to prevent them, even charging no-show fees (which is prohibited for Medicaid patients).

72.     Another key metric was the percentage of new patients seen. Management wanted at least 25% of the children treated each day to be new patients ("Acceptable"); 35% new patients was considered "Great."

73.     Dr. Jacobson was pleased with Relator's performance, and offered her a promotion to Regional Manager, overseeing not only North Country, but also his practices in Kingston and Albany, New York, and a new practice in Malone, New York, which opened on July 6, 2015.

74.     With the promotion, Defendants Jacobson and Quinn offered Relator a new bonus agreement, which provided incentive compensation based on the combined monthly production of

the Albany and Malone offices, setting a "threshold of achievement" of $180,000 per month. (Bonus Agreement) For every $10,000 per month in excess of that figure, Defendants would pay Relator an additional $100 per week.

75.      The document provided to Relator specifically requested that she accept the offer "by sending a confirmation email to Kevin [Quinn] and Dr. Jacobson."

76.      In or about June 2015 (when the outside investment took place) Emma Souli, formerly the office manager for the Albany and Kingston practices, was promoted to "Vice President of Operations."

77.      Working in tandem with Quinn, Souli focused nearly exclusively on sustaining all the offices' production numbers. If the monthly numbers fell short or threatened to do so, Souli called the office managers and dentists to loudly and angrily demand explanation for "low" numbers and what they would do to improve them. She also regularly chastised those hygienists who failed to provide sufficiently numerous and frequent dental anticavity sealant procedures.

78.      Upper management promised and paid Souli substantial bonuses if she met or exceeded monthly revenue goals.

79.      Motivated by her desire for these large bonuses, Souli pressured dentists to increase their numbers of patients and billable procedures, and pressured office managers and other staff to assist the providers in accomplishing those goals.

80.      One such manager, Maritza Mencia, who for many years had managed offices in the Bronx and Queens, complained to Relator that Souli, at Quinn's direction, would call her to push production so frequently and in such an aggressive tone that she felt harassed. She eventually quit as a result.

**D.** *Defendants Bill the Government for Medically Unnecessary Procedures on Patients, and/or Bill for Services Not Rendered*

81.     Under the above-described management pressure, and also motivated by their own incentive compensation, dentists frequently performed medically unnecessary procedures on patients.

82.     For example, Dentist Glenn Marie also worked at the Plattsburgh and other Dental Practices for Defendants. Marie regularly treated pediatric dental patients by applying composite filling to the surfaces of their teeth. However, he billed these treatments as fillings, even though he did not drill any teeth (or drill only one or two teeth and put composite on additional teeth which were all billed as fillings).

83.     Relator learned that Dr. Marie (among others) rarely if ever used a dental drill in treating patients, yet he (and others) regularly documented that they had filled cavities, which typically requires drilling the decayed tooth, filling the drilled cavity with tooth filling/compound, and finishing the tooth.

84.     This fraudulent practice was known as "thumb print dentistry."

85.     Dentist Julian Berlin, DDS, frequently worked on pediatric patients who went under general anaesthesia. Such patients were described internally as "OR" (operating room) patients.

86.     Particularly because those children were unconscious and their parents were not allowed to be present in the operating suite, dentists often did far more work than was medically necessary.

87.     Dentist Paul Chen, DDS, who primarily worked in the Plattsburgh and Malone offices, routinely performed tooth extractions (including many medically unnecessary ones) on child patients without first obtaining consent from the child's parent or guardian. This practice

resulted in many parents becoming extremely irate and complaining to staff at Defendants' dental practices.

88.     It was common for Defendants' dentists to do an entire mouth "rehabilitation" on "OR" patients, *i.e.* to conduct procedures on all teeth or nearly every tooth. Such entire mouth "rehabilitation" is a very extensive set of procedures and something very rarely medically necessary in children (who do not even have adult teeth yet).

89.     Defendants engaged in this fraudulent (and dangerous) practice solely to maximize their billings to Medicaid and other government health insurance programs. Defendants' billings for OR patients were generally much higher than for non-OR patients, and generated substantial revenue for Defendants.

90.     As a result of this egregious and intentional misconduct, Defendants routinely billed Medicaid, Medicaid-based and other dental insurances for pediatric dental services that had either been not rendered, were rendered incompletely and ineffectually or were rendered but were not medically necessary.

### E. *Defendants' Dental Practices Generate Impossible Procedure Numbers*

91.     Defendants' upper management keep detailed records showing each Dental Practice's daily number of procedures billed and the resulting revenue (which came primarily from Medicaid).

92.     The spreadsheets show that only one or two dentists ever worked on the same day at most of the Dental Practices, usually with one or two dental hygienists. (Some of the larger offices occasionally employed three dentists per day). However, this small number of providers was purportedly able to provide dental services and procedures to an inordinately large number of pediatric dental patients.

93.     Relator observed that dentists normally saw each patient personally (and billed for the same), so few if any of the patients reported would have been seen only by the hygienist.

94.     For example, Defendants' internal records report that on March 7, 2016, one dentist and one hygienist treated 52 patients in the Plattsburgh office, generating over $14,000 in revenue.

95.     Given the reported average per-procedure revenue of $43.21, these providers conducted approximately 333 procedures on that day, an average of 6.5 procedures on each child patient.

96.     The Plattsburgh office has six operatories (exam rooms) and its normal business hours were 9 a.m. to 4:30 p.m. (4:45 for the hygienist), with the dentist usually taking one hour for lunch.  Patients were booked every half hour for dentists and every fifteen minutes for hygienists, with some slots left open for emergencies.

97.     Based on that schedule, each dentist would have had time to see only about 12-13 patients, with each hygienist seeing about 20-25 patients (even if each patient were on time, each treatment was done within the allotted time, and caregivers took no time whatsoever between patients, all practical impossibilities, especially when treating children).

98.     Even so, Defendants recorded exorbitant, and self-evidently impossible, numbers for each of their Dental Practices.  For example, Defendants' internal records reflect that on March 29, 2016, two dentists and two hygienists treated 59 patients in the Teaneck, New Jersey office, generating over $6,500 in revenue.

99.     Given the reported average per-procedure revenue of $19.28, these providers purportedly conducted approximately 338 procedures on that day, an average of 5.7 procedures on each child patient.

100.    Similarly, Defendants' internal records reflect that on March 2, 2016, two dentists and two hygienists treated 59 patients at the Bronx dental practice, generating nearly $8,400 in revenue. These records also note 11 no-show patients; thus 70 patients had been scheduled for treatment that day.

101.    Given the reported average per-procedure revenue of $29.15, these providers purportedly conducted approximately 288 procedures on that day, an average of 4.9 procedures on each child patient.

102.    Defendants' internal records reflect that on March 14, 2016, one dentist and one hygienist treated 52 patients at the Malone, New York dental practice (with 4 no-shows), generating $10,850 in revenue.

103.    In contrast to the Plattsburgh office, the Malone office had only *three* operatories. The office was so small that assistants had to carry used (and uncovered) dental instrument trays through the reception area/patient waiting room or through one of the operatories to get to the sterilization area, which practice was non-compliant with health and safety rules and potentially dangerous to patients and staff.

104.    Given the reported average per-procedure revenue of $38.07, these providers purportedly conducted 285 procedures on that day, an average of 5.5 procedures on each child patient.

## F. *Jacobson and HQRC Recruit and Transport Dentists to Enhance Revenue; Providers Pay Personal Kickbacks*

105.    During Relator's tenure working at North Country and supervising other offices, she learned that many employees received "under the table" bonuses from dentists who wanted to maximize their compensation by increasing the number of patients they saw.

106.    Defendant Glenn Marie ("Dr. Marie") was a Staten Island dentist who Jacobson and Quinn had recruited to work on a *per diem* basis at various of the Dental Practices, primarily at North Country in Plattsburgh.

107.    Dr. Marie agreed to travel to Plattsburgh to perform dentistry two days a week (he would stay in Plattsburgh one night).  However, this required him to take a flight from New York City to Burlington, Vermont, and then either rent a car or have someone from the Plattsburgh office pick him up at the Burlington airport.

108.    Dr. Marie understood that the purpose of these fly-in visits was to maximize the revenue he was producing during those two days of work in Plattsburgh.

109.    Indeed, Dr. Marie boasted to Relator that he could do the work of two dentists in the same amount of time.  He also told her that Quinn would be happy with what he produced, because management was looking for increased numbers.[2]

110.    In or about March 2016, soon after he started flying up to Plattsburgh, Dr. Marie approached Relator (who, as office manager, had significant control over scheduling patients) with a proposal:  if she scheduled enough patients and procedures to generate more than $8,000 during his two-day visit, he would pay her $300 in cash.  (He later increased this bonus to $400).

111.    Relator complied, making efforts to schedule as many patients as possible during Dr. Marie's time at the Plattsburgh office.

112.    However, she noticed that Dr. Marie was also performing an inordinate number of procedures per patient.  She particularly noticed that many if not most of the children Dr. Marie treated got multiple fillings.

---

[2] All verbal statements described in this Complaint are recounted in substance and in part.

113.    She learned that in many if not most cases, Dr. Marie was not actually drilling teeth (or even finding and diagnosing cavities), he was merely placing composite material or anti-cavity compounding on undrilled teeth (which takes very little time).  However, he (through the Dental Practice) billed for these procedures as if he had actually done a complete filling, including drilling the cavity and then properly filling the tooth.

114.    Relator's confirmed her suspicions upon learning from hygienists and dental assistants that Dr. Marie never used a drill at all in treating patients, which would be a physical impossibility for filling cavities and doing other kinds of dental procedures.

115.    Defendants falsely and fraudulently billed Medicaid, and other government insurance programs, for many of these medically unnecessary and/or improperly done dental procedures.

### G. *Relator Complains to Management about the Fraud, and is Fired*

116.    Deeply concerned and disturbed about Dr. Marie's behavior, and having discovered the scope and breadth of Defendants' fraud, Relator reported the wrongdoing to Quinn and Souli.

117.    Among other things, Relator told Quinn that Dr. Marie was overtreating because he was expected to increase and maximize revenue.

118.    Quinn responded that Dr. Jacobson talks to Dr. Marie about clinical matters, and that neither he (Quinn) nor Relator should get involved in that.

119.    Souli subsequently admonished Relator that she had reviewed the billing records and that Relator was wrong and that the billing was correct.

120.    Several days later, Relator complained to Company Regional Manager Diane Stranis, who was a relatively new hire, that Quinn and Souli had dismissed her complaints and told her to back off.

121.    On May 27, 2016, not long after she voiced her complaints, Relator was fired. Stranis had come to the Plattsburgh office unannounced, ostensibly to interview candidates for the Malone office manager position. At the end of the day, asked Relator to join her in a conference call with Souli.

122.    Relator presumed that the call with Souli would be to follow up on the billing issues she had raised. However, once Souli got on the phone, Stranis told Relator that the staff had complained that Relator had not kept staff schedules properly and was over-reporting revenue to boost her bonuses so she was being terminated.

123.    Shocked, Relator immediately recognized that their reasons for firing her were pretextual. Relator often had to juggle staff schedules because Souli continually gave her the monthly dentists' schedules at the last minute, and rather than spend money to hire more staff, management made the current staff commute among offices, sometimes long distances, to cover the providers. Further, Relator certainly was not among the managers and providers who were responsible for over-billing. She demanded that they tell the truth about why she was being terminated.

124.    Stranis then told Relator that there had been allegations that Relator had engaged in sex at the office. Relator vehemently denied that allegation.

125.    Shortly after she fired Relator, Stranis herself was terminated. Shortly thereafter, Stranis phoned Relator and asked if Relator had retained an attorney. When Relator said no, Stranis admitted that the real reason Relator had been fired was because Quinn felt intimidated by Relator, and was worried that Relator would sue the company after she complained about the fraud.

126.    Stranis said that on her third day on the job, management had spent an entire day with Stranis strategizing about how to get rid of Relator. Using a whiteboard, Quinn concocted a

plan whereby Stranis would micro-manage Relator, calling her frequently and demanding to go through office reports.

127.     After that day, Quinn pressured Stranis to follow his plan, and criticized her for not harassing Relator. Stranis pushed back, explaining that she was too busy and constantly on the road between offices, and that in any event managers should trust their people to do their job.

128.     Stranis stated that Quinn eventually directed her to fire Relator and to explain that she was being terminated because staff had complained about her scheduling practices, that she was over-reporting revenue, and had been observed having sex in the office. Stranis objected because she knew there was no evidence to support those allegations, and added that managing the Plattburgh office was a nightmare for Relator and she was surprised that she hadn't already quit.

129.     Stranis then asked Quinn why he wanted to fire Relator, and why he was so obsessed about her given the huge issues they faced because of the fraud. Quinn said that it was because Relator had complained about the fraud and was afraid that she would sue the company. Quinn insisted, hinting that Stranis herself would be fired if she did not comply, so Stranis fired Relator as directed.

130.     Stranis and Relator spoke on the phone for more than an hour, discussing the fraud and how they might pursue a *qui tam* lawsuit. Stranis broadly corroborated and confirmed Relator's suspicions.

131.     Among other things, Stranis told Relator that Dr. Paul Chen had taken X-rays of patients that Dr. Marie had previously treated, and the X-rays showed that Dr. Marie had not done fillings that he had billed for.

132.    At a recent staff meeting run by Quinn and Samantha Lambert, Stranis said that Quinn had joked that one of his dentists needed Ritalin, which was great because he could perform so many more procedures.

133.    Stranis told Relator that she, too, had complained to management (Dr. Jacobson and Quinn) about the fraud. Stranis characterized Defendants as running a lucrative Medicaid mill.

## H. *HQRC Management Knows About the Fraud, and Condones and Encourages Illegality*

134.    As previously described in detail, HQRC Management, including Defendants Dr. Jacobson and Kevin Quinn, are not only well aware of the fraudulent schemes, they condone and encourage this illegality.

135.    Defendants' Management, including Jacobson, Quinn, and Souli, know (or should know, or recklessly disregard the fact) that dentists and other providers are regularly documenting (and Defendants are billing for) a daily volume of patient visits and a number of procedures that cannot physically take place given each office's business hours and number of caregivers.

136.    Defendants' Management, including Jacobson, Quinn, and Souli, know (or should know, or recklessly disregard the fact) that dentists and other providers are regularly documenting (and Defendants are billing for) medically unnecessary dental procedures, as well as dental services not rendered, or services not fully rendered.

137.    Defendants' Management, including Jacobson, Quinn, and Souli, know (or should know, or recklessly disregard the fact) that the incentive compensation policies and practices that they have put in place are *per se* unlawful, since they compensate caregivers and other personnel based solely on patient volume and increased revenue, and furthermore provide a strong economic

incentive to provide medically unnecessary services, or to bill for services not rendered, or not fully rendered.

138. Defendants' Management, including Jacobson, Quinn, and Souli, know (or should know, or recklessly disregard the fact) of these fraudulent schemes because Relator expressly informed them that they were taking place.

139. As Relator learned, and as is described in part above, Defendants' fraudulent schemes and unlawful practices were not confined to the dental practices that Relator managed, or that are described specifically in this Complaint. Instead, as Defendants' Management well knew, and as documents demonstrate, these fraudulent schemes and unlawful practices were encouraged and carried out at all of the named Defendant Dental Practices.

## VII.  THE GOVERNMENT HAS BEEN DAMAGED AS A RESULT OF DEFENDANTS' CONDUCT

140. As a direct and intended result of their fraud, Defendants have submitted, and caused to be submitted, thousands of false claims for prescription drug reimbursement from Medicaid and other government health insurance programs, including the time period covered by this Complaint and within the applicable statutes of limitations.

141. As alleged previously herein, Defendants routinely billed for dental services that had not been rendered, or had not been rendered as claimed, based on false documentation.

142. The Dental Practices billed for hundreds of false and fraudulent services each day, because Relator estimates that some ninety percent (90%) of patient visits generated false and fraudulent billing.

143. Based on these numbers, Relator estimates that Defendants' unlawful scheme has caused the federal and state governments to be defrauded of millions in taxpayer funds.

## VIII.  CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

(False Claims Act: Presentation of False Claims)
(31 U.S.C. § 3729(a)(1)(A))

144.    Relator repeats and incorporates by reference the allegations contained in

Paragraphs 1 through 143 of this Complaint as if fully set forth herein.

145.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts

alleged herein the Defendants have knowingly presented or caused to be presented false or

fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

### SECOND CAUSE OF ACTION

(False Claims Act: Making or Using False
Record or Statement to Cause Claim to be Paid)
(31 U.S.C. § 3729(a)(1)(B))

146.    Relator repeats and incorporates by reference the allegations contained in

Paragraphs 1 through 143 of this Complaint as if fully set forth herein.

147.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts

alleged herein the Defendants have knowingly made, used, or caused to be made or used, false

records or statements – i.e., the false certifications and representations made or caused to be

made by Defendants – material to false or fraudulent claims in violation of 31 U.S.C. §

3729(a)(1)(B).

### THIRD CAUSE OF ACTION

(False Claims Act: Conspiracy)
(31 U.S.C. § 3729(a)(1)(C))

148.    Relator repeats and incorporates by reference the allegations contained in

Paragraphs 1 through 143 of this Complaint as if full set forth herein. As more particularly set

forth in the foregoing paragraphs, by virtue of the acts alleged herein the Defendants conspired to make or present false or fraudulent claims and performed one or more acts to effect payment of false or fraudulent claims.

## FOURTH CAUSE OF ACTION

(New Jersey False Claims Act)
(N.J. Stat. §§ 2A:32C-1 through 2A:32C-17)

149.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 143 of this Complaint as if fully set forth herein.

150.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New Jersey State Government for payment or approval.

151.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Jersey State Government to approve and pay such false and fraudulent claims.

152.    The New Jersey State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

153.    By reason of the Defendants' acts, the State of New Jersey has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

154.    Pursuant to N.J. Stat. § 2A:32C-3, the State of New Jersey is entitled to three times the amount of actual damages plus the maximum penalty of $12,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

### FIFTH CAUSE OF ACTION

(New York False Claims Act)
(N.Y. State Fin. Law §§ 187 *et seq.*)

155.    Relator repeats and incorporates by reference the allegations contained in

Paragraphs 1 through 143 of this Complaint as if fully set forth herein.

156.    By virtue of the acts described above, Defendants knowingly presented or caused

to be presented, false or fraudulent claims to the New York State Government for payment or

approval.

157.    By virtue of the acts described above, Defendants knowingly made, used, or

caused to be made or used false records and statements, and omitted material facts, to induce the

New York State Government to approve and pay such false and fraudulent claims.

158.    The New York State Government, unaware of the falsity of the records,

statements and claims made, used, presented or caused to be made, used or presented by

Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or

conduct of Defendants as alleged herein.

159.    By reason of the Defendants' acts, the State of New York has been damaged, and

continues to be damaged, in substantial amount to be determined at trial.

160.    Pursuant to N.Y. State Fin. Law § 189.1(g), the State of New York is entitled to

three times the amount of actual damages plus the maximum penalty of $12,000 for each and

every false or fraudulent claim, record or statement made, used, presented or caused to be made,

used or presented by Defendants.

## SIXTH CAUSE OF ACTION

(False Claims Act: Retaliation)
(31 U.S.C. § 3730(h))

161.    Relator repeats and incorporates by reference the allegations contained in
Paragraphs 1 through 143 of this Complaint as if fully set forth herein.

162.    As specifically set forth in the foregoing Paragraphs, particularly Paragraphs 111
through 124, Defendants HQRC, North Country Pediatric Dentistry, Kevin Quinn, and Barry
Jacobson, discharged, demoted, threatened, harassed, and/or discriminated against the Relator in
the terms and conditions of her employment after Relator lawfully reported what she believed to
be fraudulent conduct or wrongdoing to her superiors, in violation of 31 U.S.C. § 3730(h).

163.    As a direct result of Defendants' violations, Relator has suffered injury, among
other things in the form of lost compensation and benefits. Relator seeks compensatory damages
and other appropriate statutory relief pursuant to this Section.

## IX.    DEMANDS FOR RELIEF

**WHEREFORE**, Relator, on behalf of the United States and the States of New Jersey and
New York, demands judgment against the Defendants, ordering that:

**As to the Federal Claims:**

a.  Pursuant to 31 U.S.C. § 3729(a), Defendants pay an amount equal to three times the
amount of damages the United States Government has sustained because of Defendants' actions
which Relator currently estimates to be in the hundreds of millions of dollars, plus a civil penalty
of not less than $6,500 and not more than $11,000 or such other penalty as the law may permit
and/or require for each violation of 31 U.S.C. § 3729, *et seq.*;

b.  Relator be awarded the maximum relator's share authorized by 31 U.S.C. § 3730(d) of
the False Claims Act and/or any other applicable provision of law;

c. Relator be awarded such relief as is appropriate under the provisions of 31 U.S.C. §

3730(h) for retaliatory discharge, including:

        (1)    two times the amount of back pay plus interest;

        (2)    compensation for special damages sustained by Relator in an amount to be determined at trial;

        (3)    litigation costs and reasonable attorneys' fees; and

        (4)    such punitive damages as may be awarded under applicable law;

d. Relator be awarded all costs and expenses of this action, including attorneys' fees as

provided by 31 U.S.C. § 3730(o) and any other applicable provision of the law; and

e. Relator be awarded such other and further relief as the Court may deem to be just and

proper.

**As to the State Claims:**

e. Relator and the States of New Jersey and New York be awarded statutory damages in

an amount equal to three times the amount of actual damages sustained by the States as a result

of Defendants' actions, as well as the maximum statutory civil penalty for each violation by

Defendants within the States, as provided by N.J. Stat. § 2A:32C-3 and N.Y. Fin. Law §

189.1(g);

f. Relator be awarded the maximum relator's share authorized by N.J. Stat. § 2A:32C-

7(a) and N.Y. State Fin. Law § 190.6;

g. Relator be awarded all costs and expenses associated with the pendent State claims,

plus attorney's fees as provided pursuant to N.J. Stat. § 2A:32C-8 and N.Y. State Fin. Law §

190.7;

h. Relator and the States of New Jersey and New York be awarded such other and further

relief as the Court may deem to be just and proper.

## TRIAL BY JURY

Relator hereby demands a trial by jury as to all issues.

**SPIRO HARRISON**

By: _____
     Eric H. Jaso

830 Morris Turnpike
Second Floor
Short Hills, NJ 07078
(973) 232-0881
ejaso@spiroharrison.com
*Attorneys for Plaintiff/Relator*

Dated:  April 25, 2017